*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* MASON/WILLIAMS, Minors.

UNPUBLISHED
April 13, 2023

No. 362357
Wayne Circuit Court
Family Division
LC No. 2021-000944-NA

*In re* MASON/WILLIAMS, Minors.

No. 362772
Wayne Circuit Court
Family Division
LC No. 2021-000944-NA

Before: CAMERON, P.J., and JANSEN and BORRELLO, JJ.

PER CURIAM.

In these consolidated appeals,[1] the Michigan Department of Health and Human Services (DHHS) appeals as of right the trial court's order declining to terminate respondent's parental rights to her minor child, RM. Respondent also appeals as of right the trial court's order terminating her parental rights to her other two children, JW1 and JW2, under MCL 712A.19b(3)(b)(*i*), (b)(*ii*), (g), (j), and (k)(*iii*)-(*v*).[2] We affirm in part, and reverse in part.

## I. BACKGROUND FACTS AND PROCEDURAL HISTORY

Respondent has a history with Children's Protective Services ("CPS") that dates back to 2014 and includes several investigations and substantiated allegations related to improper supervision, threatened harm, domestic violence, physical abuse, and in utero drug exposure. Two

---

[1] *In re Mason/Williams Minors*, unpublished order of the Court of Appeals, entered September 7, 2022 (Docket Nos. 362357 and 362772).

[2] RM's father is not a party to this appeal. The putative father of JW1 and JW2 died before these proceedings. Respondent gave birth to another child, BM, while these proceedings were ongoing. BM is the subject of another petition in the trial court and is not part of this appeal.

of her children tested positive for controlled substances at birth. Respondent also has a history of exposing the children to domestic violence involving RM's father. These earlier events did not result in court intervention or the removal of the children from respondent's care. Instead, CPS offered respondent preventative services.

In September 2021, respondent brought seven-year-old JW2 to a hospital emergency room. The child presented with second and third-degree burns over 40% of his body. JW2 also had "loop marks" on his legs. Based on respondent's inconsistent reporting of events, JW2's age, and the pattern and severity of the burns, an examining physician concluded that the child's injuries were the result of nonaccidental trauma. JW2 remained hospitalized for more than a month for treatment of burns to his lower extremities, genitals, buttocks, hands, arm, and face. During the CPS investigation, RM was placed with his father. Eventually, JW1 and JW2 were placed together in the home of a maternal great aunt.

On October 13, 2021, DHHS filed a petition seeking termination of respondent's parental rights to her three oldest children at the initial disposition. The court authorized the petition and, based on the nature of JW2's injuries, held that reasonable efforts to prevent removal or reunite the family were not required. In February 2022, respondent pleaded no contest to the allegations in the petition for purposes of establishing both jurisdiction and statutory grounds for termination of parental rights. At a best-interest hearing that followed, the court found that termination of respondent's parental rights was in the best interests of JW1 and JW2, but it found that termination of respondent's rights was not in RM's best interests. These appeals followed.

## II. STANDARD OF REVIEW

Once a statutory ground for termination has been established, the trial court must find that termination of parental rights is in the child's best interests before it can terminate parental rights. *In re Olive/Metts Minors*, 297 Mich App 35, 40; 823 NW2d 144 (2012). Whether termination of parental rights is in a child's best interests must be proven by a preponderance of the evidence. *In re Moss,* 301 Mich App 76, 90; 836 NW2d 182 (2013). " 'Preponderance of the evidence' means such evidence as, when weighed with that opposed to it, has more convincing force and the greater probability of truth." *People v Cross*, 281 Mich App 737, 740; 760 NW2d 314 (2008). This Court reviews a trial court's findings of fact in termination proceedings, including whether termination of parental rights is in a child's best interest, for clear error. *In re White,* 303 Mich App 701, 713; 846 Mich App 701 (2014). A trial court's findings of fact are clearly erroneous if a reviewing court is "definitely and firmly convinced that it made a mistake." *In re Keillor,* 325 Mich App 80, 85; 923 NW2d 617 (2018).

## III. BEST INTERESTS

"If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of parental rights and order that additional efforts for reunification of the child with the parent not be made." MCL 712A.19b(5). The court may consider several, non-exhaustive, factors when deciding whether termination of parental rights is in a child's best interests, including the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home. *In re Olive/Metts Minors*,

297 Mich App at 41-42. The court may also consider psychological evaluations, the child's age, continued involvement in domestic violence, and a parent's history. *In re Jones*, 286 Mich 126, 131; 777 NW2d 728 (2009).

"The trial court should weigh all the evidence available to determine the children's best interests." *In re White*, 303 Mich App at 713. In considering the child's best interests, the trial court's focus must be on the child and not the parent. *In re Moss*, 301 Mich App at 87. When more than one child is involved, a trial court must consider each child's best interests separately. *In re Olive/Metts Minors*, 297 Mich App at 42. A trial court need not, however, make "individual" and "redundant factual findings" if the children's interests do not differ significantly. *In re White*, 303 Mich App at 715-716.

## A. DOCKET NO. 362357

DHHS argues that the trial court clearly erred by concluding that termination of respondent's parental rights to RM was not in that child's best interests. We agree.

In analyzing whether termination was in RM's best interests, the trial court noted in passing respondent's history of "violent outbursts" and the events that resulted in injuries to JW2. However, the trial court focused the bulk of its analysis on RM's bond with respondent. It found that any potential danger to RM could be "mitigated through some other means that [RM] can still see his mother . . . . [T]here's certainly the possibility that the father could be granted full legal and physical custody. The mother could be given supervised visits only."

Again, the standard of proof is a preponderance of evidence. *In re Moss*, 301 Mich App at 90. Termination is in the child's best interests where the evidence in favor of termination has more weight than the evidence against termination. *Cross*, 281 Mich App at 740. Looking to the whole of the record, while there was evidence presented that RM and respondent shared a bond, the greater weight of the evidence favored of termination.

The record established that between 2014 and 2017, CPS received and substantiated complaints of improper supervision, threatened harm from exposure to domestic violence, substance abuse, and in utero drug exposure. Specifically, two of the children tested positive for THC at birth. Further, the children were present when respondent stabbed RM's father with a knife and when she later attempted to run him over with a car. As a result of these events, respondent was offered voluntary services to avoid court involvement and prevent the children's removal from the home. Although respondent participated in the preventative services, it is clear that she did not benefit from them. She did not learn to manage her anger issues. This conclusion is reinforced by a review of the events that precipitated the filing of the petition in the present matter.

The evidence also showed that in September 2021, respondent became enraged when seven-year-old JW2 experienced diarrhea and soiled his pants more than once over a two-day period. Respondent admitted that she struck JW2 in anger with a cord. She denied, however, responsibility for the second- and third-degree burns that JW2 sustained over 40% of his body after being submerged in scalding hot bathwater. Respondent consistently maintained that JW2's burns were incurred accidentally, but medical personnel concluded that JW2's burns were

nonaccidental and more likely the product of abuse. Indeed, one doctor opined, on the basis of respondent's inconsistent statements, JW2's age, and the nature of the burn patterns, that JW2 was submerged in the bathtub while his ankles were bound. At the very least, the record supports an alternative finding that respondent beat seven-year-old JW2 with a cord and then, through fear and intimidation, forced JW2 to enter a bathtub that she knew was too hot for the child. This scenario is supported by statements made by JW1, who explained that she heard respondent tell JW2 to get his "a\*\* into the tub" and then heard JW2 scream, "it's too hot, it's too hot." According to JW1, respondent replied that she did not care, and respondent later instructed JW1 to lie about the events. This evidence indicates that respondent either physically tortured JW2 by binding his ankles and placing him in a bathtub that was too hot and unsafe, or she intentionally forced him to enter the tub on his own accord using fear and intimidation. Neither scenario supports respondent's position that JW2's burns were sustained by accident.

The trial court also did not consider the emotional and physical abuse that RM had already endured. In addition to testing positive for THC at birth, RM was exposed at a very young age to domestic violence perpetrated by respondent against RM's father. Further, RM witnessed respondent physically and emotionally abuse his siblings, JW2 and JW1. Both of these slightly older siblings made statements that respondent had struck them with an electrical cord, threw them down the stairs, and threatened to kill them. The evidence suggested that RM was witness to this abuse. He stated during his forensic interview that he saw respondent hit JW2 "hard" in the shower. Finally, there was also evidence that respondent physically abused RM, not just his older siblings. During his Kids Talk interview, RM, then five years old, disclosed that respondent "always whoops" him. The abuse was further corroborated to some extent by RM's father. While the father denied that respondent hit her sons with cords, he acknowledged that respondent had used a belt on the boys. There is no evidence that the court considered the extent of the emotional and physical abuse RM had already endured when it decided what was in this child's best interests.

In addition to the foregoing evidence, there was also testimony from respondent's treating psychologist, Dr. Cherie Wilcox, that respondent's anger-management issues have been long-standing, dating back to at least her high school years. Moreover, Dr. Wilcox recognized the distinct possibility that respondent could have anger-management issues throughout her life.

The trial court also concluded that, because RM was placed with his legal father, any risk to RM was mitigated. The court found that this factor weighed in favor of the preservation of respondent's parental rights. However, there was little evidence in the record to support the court's finding in this regard. Considering the nature of respondent's anger issues, such as her explosive response to a child's soiled pants, there remained a distinct possibility that even under his father's watchful eye, RM might be harmed by respondent. Although the father testified that he and respondent had agreed that he should have full legal and physical custody of RM, he anticipated that the child would spend some weekends with respondent. Also, the father was adamant that RM should not be deprived of the opportunity to have a relationship with respondent. Further, there was some evidence that the father was undisturbed by the fact that, unbeknownst to DHHS, respondent gave birth to BM, left the hospital with the newborn, and for a brief period had him in her unsupervised care. The court's confidence in the father's ability to protect RM from the risks posed by a continued relationship with respondent is misplaced.

The court also found that because RM was placed in his father's custody, and thus adoption was not contemplated, this weighed against terminating respondent's parental rights. Indeed, the court held that when adoption is not part of the permanency plan, the burden is on DHHS to show not simply the potential for neglect, but that a parent is dangerous to a child. The trial court abdicated its obligation to weigh all the evidence available to it to determine the *child's* best interests. Further, the court's distinction between neglect and "danger" in the context of a best-interest analysis appears arbitrary. Indeed, we can contemplate several scenarios where extreme neglect can be as harmful as the intentional physical abuse of a child.

Respondent similarly argues that because her children are placed in stable homes, particularly RM with his legal father, termination of her parental rights will not do anything to improve the children's safety and stability. Taking the court's and respondent's position to its logical extreme, it would rarely be necessary to terminate a parent's parental rights if a child were placed with the other parent. This Court, however, has rejected the suggestion that, if a child is placed with a responsible parent, it is unnecessary to terminate the parental rights of an abusive or neglectful parent. For example, in *In re Marin*, 198 Mich App 560; 499 NW2d 400 (1993), this Court acknowledged, as respondent argues here, that

> [i]t can be reasonably argued that there is no need to terminate the parental rights of one parent where the child remains in the care and custody of the other parent and there is no basis for removing the child from the custodial parent's care. While the noncustodial parent may not be a fit parent and may, in fact, as is the case here, pose a threat to the child, those concerns could be addressed through traditional custody and visitation proceedings in the circuit court, as well as, through the criminal justice system, as occurred here. [*Id*. at 565.]

However, this Court explicitly rejected this argument, finding instead that "the Legislature envisioned and intended that the probate court could terminate the parental rights of just one parent." *Id*. at 566. Accordingly, the fact that RM would be in the custody of his legal father did not preclude termination of respondent's parental rights. It is just one factor to be considered. In this regard, the court relied on this factor almost exclusively when it declined to terminate respondent's parental rights, to the point that it failed in its responsibility to consider all the evidence when determining RM's best interests.

Finally, the court's failure to terminate respondent's parental rights denied RM the opportunity to achieve stability, permanency, and finality—benefits that were afforded to his slightly older siblings. For years to come, respondent will maintain the ability to challenge the father for custody of RM. Further, should anything happen to the father, respondent would be positioned to exercise her parental rights and possibly obtain custody of RM. Thus, the court's ruling has deprived RM of stability, permanency, and finality.

Although the court mentioned in passing that respondent had "a history of violent outbursts including the incident that brought this case to court," it did not consider in any meaningful way the implications of respondent's inability to control her temper and the harm it caused to her children. Had the court properly balanced all the evidence before it, and given that evidence the weight it deserved, it would have been left with the inescapable conclusion that under no circumstance would RM benefit from a continued relationship with respondent. Accordingly, we

are left with a definite and firm conviction that a mistake has been made. More than a preponderance of the evidence favored termination of respondent's parental rights to RM. Therefore, we reverse in part the trial court's order and remand this case to the trial court for entry of an order terminating respondent's parental rights to RM.

## B. DOCKET NO. 362772

Respondent challenges the trial court's finding that termination of her parental rights to JW1 and JW2 was in the children's best interests. We disagree.

When assessing a child's best interests, it is appropriate for the court to consider the likelihood that the child could be returned to his or her parent's home within the foreseeable future, if at all. *In re Frey,* 297 Mich App 242, 249; 824 NW2d 569 (2012). In this case, the evidence supported a finding that respondent would be unable to safely parent her children anytime soon. To her credit, after the children were removed, respondent voluntarily participated in some services. She apparently completed a parenting class and an anger-management program. However, respondent's therapist, Dr. Wilcox, explained that respondent's anger issues were deep-seated and long-standing. As such, the therapist could not rule out that respondent would be addressing her anger issues throughout her life. Moreover, the therapist noted that respondent was only participating in therapy sessions at most every three weeks. Dr. Wilcox insisted that if respondent were granted unsupervised visits with the children, their sessions would have to increase to a greater frequency. At the time of termination, respondent was not in a position to safely parent her children because there was no evidence that she had adequately addressed her inability to control her anger.

By contrast, the children were doing well in the care of a maternal great aunt. JW1 was approximately 10 years old and JW2 was almost nine at the time the court terminated respondent's parental rights. This relative caregiver provided for the children's medical, educational, and physical needs. More significantly, the caregiver ensured that JW2 received the necessary treatment for his extensive burns. The maternal great aunt wished to adopt both children should respondent's parental rights be terminated.

Respondent suggests that the parent-child bond could be repaired. This is highly unlikely. Respondent irreparably damaged any bond that may have existed between her and her children when she physically abused both of the children and threatened to kill them. The Clinic for Child Study clinician explained that these types of threats could be emotionally traumatic and psychologically damaging to a child, and evidence showed that the children have, in fact, been traumatized by respondent's conduct. Both children were afraid of respondent, neither wished to visit with her, and they expressed a desire to remain in their aunt's care. Consequently, during the 22 months the children were in care, respondent had no parenting time. Respondent attended a single visit to the burn clinic long after JW2 had begun treatment. This increased JW2's anxiety and provoked a stress response in the child, such that he began to scratch at his wounds. The caseworker in attendance was required to hold his hand to prevent JW2 from reopening wounds and further damaging his healing skin. This evidence indicates that a continued relationship with respondent would be harmful to the children's well-being.

The court properly acknowledged that placement with the maternal great aunt would favor reunification, but it went on to properly balance relative placement with other relevant factors. The court noted, in general, respondent's anger-management issues and the events that brought the children into care. It then concluded that termination of respondent's parental rights to JW1 and JW2 was necessary to provide an avenue by which the aunt could adopt the children and provide them the permanency, stability, and finality they required. Even though placement with a relative weighs against termination, and such a placement must be considered, a trial court may terminate parental rights in lieu of placement with relatives if it finds that termination is in the child's best interests. *In re Olive/Metts Minors*, 297 Mich App at 43. As to JW1 and JW2, the trial court properly balanced relevant factors and it did not clearly err by finding that termination of respondent's parental rights was in the children's best interests despite that they were placed with a relative.

In sum, the record supports a finding that respondent was not able to safely parent her children, and would not be able to do so within a reasonable time. By contrast, the children were thriving in their relative placement and their needs were being met. Termination of respondent's parental rights was the best avenue for the children to achieve stability, permanency, and finality. Accordingly, the trial court did not clearly err when it found that termination of respondent's parental rights was in JW1's and JW2's best interests.

Affirmed in part, reversed in part. We remand for further proceedings consistent with this opinion. We do not retain jurisdiction.


/s/ Thomas C. Cameron
/s/ Kathleen Jansen
/s/ Stephen L. Borrello

-7-